IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 17, 2016 Session

**ANDREA RENEA HOPWOOD v. COREY DANIEL HOPWOOD**

**Appeal from the Chancery Court for Williamson County**
**No. 41444    Michael Binkley, Chancellor**

_____

**No. M2015-01010-COA-R3-CV – Filed June 23, 2016**
_____

This appeal concerns several issues relative to a divorce. We agree with the trial court that Mother is a candidate for rehabilitative alimony. We reverse the trial court as to the duration of the award, however, reducing the award to eight years. We also vacate the trial court's ruling with regard to the amount of the alimony award and remand to the trial court for reconsideration of Father's ability to pay alimony consistent with his other obligations. Finally, we reverse the trial court's award of attorney's fees anticipated to be incurred on appeal and vacate the trial court's award of all of Mother's requested attorney's fees, instead remanding to the trial court for a determination of only those fees attributable to child custody and child support. All other issues are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Reversed in Part; Vacated in Part; and Remanded.**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the Court, in which RICHARD H. DINKINS, and BRANDON O. GIBSON, JJ., joined.

Robbie T. Beal and Erin W. Nations, Franklin, Tennessee, for the appellant, Corey Daniel Hopwood.

Russ Heldman, Franklin, Tennessee, for the appellee, Andrea Renea Hopwood.

**OPINION**

Andrea Renea Hopwood ("Mother") and Corey Daniel Hopwood ("Father") were married on December 31, 1999. They were married for fourteen years and had four children. Mother filed for divorce against Father on October 1, 2012, alleging

irreconcilable differences and inappropriate marital conduct. Father, through counsel, filed a counter-complaint on October 19, 2012, alleging irreconcilable differences, inappropriate marital conduct, and adultery. The parties attempted mediation twice, both of which were unsuccessful.

The parties entered into several years of litigation.[1] Mother was awarded alimony pendente lite and possession of the marital home. During the years of litigation, Mother alleged that Father failed to properly and timely respond to discovery. Father's counsel was allowed to withdraw from representation in December 2014. The trial court eventually conducted a trial on February 2 and 3, 2015. Father was represented by counsel whom he had retained the week prior to trial.[2]

Kalel, the parties' fifteen-year old daughter, testified first. She stated that she wished to spend as much time as possible with Mother, as Mother is the parent who is most involved in her and her siblings' lives. She also testified that Father disrespected Mother, often criticizing her efforts for the family and her intelligence. Kalel also alleged that Father tried to manipulate her and her siblings and video-taped their interactions with Father for evidentiary purposes.[3] Kalel also testified as to her and her siblings' sleeping arrangements while in Father's care, which require the three younger siblings to sleep in a room with Father at his parents' home, while Kalel is forced to sleep on a mattress on the floor of grandparents' office. This office also contains an unlocked gun cabinet, but Kalel testified that she is familiar with firearms.

Mother testified that the parties had married approximately fifteen years prior, when she was little more than a teenager. She stated that the parties' relationship had been tumultuous from the beginning, with Mother describing Father as charming but manipulative and deceitful. She testified to several instances of domestic violence perpetrated by Father but admitted that when the parties previously separated as a result of these episodes, they later agreed to reconcile. During one separation in 2002, Mother had an extramarital affair; Mother informed Father of the affair years later in 2010. Mother testified that after the confession, Father's behavior toward her was worse than before. According to Mother, around this time, Father began threatening to file divorce proceedings approximately every six months.

According to Mother, in 2002, the parties decided Mother should not seek employment outside the home. Up until the time of divorce, Mother had been the

---

[1] The parties and the clerk are to be commended for fully complying with Rule 24 of the Tennessee Rules of Appellate Procedure in excluding extraneous discovery materials from the record in this cause.

[2] Father's appeal counsel did not represent him at trial.

[3] No such recordings were admitted into evidence.

children's primary caregiver because Father worked significant hours to financially provide for the family. Mother testified that it requires considerable time to take each of the parties' four children to their various activities. Mother also testified as to several examples of why she believed Father could not properly parent the children, including Father's serious anger management issues, episodes of violence against the children, and his nightly drinking that occurred after Mother informed him of the affair.

As to Father's income or business ventures, Mother testified that Father took care of most financial matters and that she was generally not privy to the finances during the marriage. Mother and her attorney, however, created a chart that was submitted as an exhibit outlining the deposits into the marital bank account attributable to Father from 2010 to 2014. Mother asserted that this exhibit showed income to Father around or in excess of $100,000.00 per year until 2014. Mother also testified that certain expenses, such as the parties' cell phone bills or health insurance, were often paid directly by Father's companies or employers. Mother also testified to an incident where she found a significant amount of cash in Father's car, noting that Father often made cash deposits in the parties' bank account.

In 2013, Mother began working as a teacher's assistant, earning $11.83 per hour and working 35 hours per week. Mother also testified that she recently enrolled at a community college to allow her to teach math in the future. Mother testified that if she attended classes part-time, she anticipated graduating in eight years. Mother admitted on cross-examination, however, that she had not considered whether attending summer classes would decrease that time frame. Mother requested alimony in the amount of $2,500.00 per month for a minimum of fifteen years. Mother also detailed her valuation of the marital residence, asked that she be awarded the home in the divorce, and detailed her valuation and proposed division of other marital debts and assets.

Father testified that he completed high school and one or two semesters of college. He has also obtained some technical certifications for Microsoft. Much of Father's testimony concerned his income and ownership interest in various companies in the years prior to the initiation of the divorce proceedings. Several times the trial court took issue with Father's answers, characterizing them as untruthful or evasive.

According to Father, he began working as an employee for Pinnacle Technology ("Pinnacle") in 2003. Father testified that he was eventually offered an ownership interest in Pinnacle. Father admitted that he had no documents that would evidence his interest in Pinnacle but testified that he made no capital contribution to the company. The testimony at trial was unclear as to Father's share in Pinnacle throughout his admitted involvement with the company, which may have been as great as 40% around 2005. Father testified, however, that at the time he allegedly sold his interest in Pinnacle, his share was approximately 25%. Father testified that he sold his ownership interest in Pinnacle in

2012 for $40,000.00. Mother testified, however, that Father did not inform her of the sale until it had been completed and that he told her he only received approximately $25,000.00 from the sale. Father testified that Pinnacle's other partners, Jeff and Julian Cornett, had simply valued his interest at $40,000.00 and that Father had accepted that value as fair given that Father made no capital contribution to the company, despite the fact that Father agreed to transfer only 20% of the stock in Pinnacle to Julian Cornett in 2005 in exchange for a revolving line of credit of $100,000.00. Father testified that he never made more than $82,500.00 per year from Pinnacle. Father eventually left his employment with Pinnacle in 2013, citing the downturn of the business and his inability to make enough sales to cover his base salary of $60,000.00.

Father also testified that prior to the divorce, he held ownership interests in other companies as well. First, Father testified that he became involved in Custom Renovations Group ("CRG") between 2008 and 2012. Father testified that CRG purchased property that it rented out to Pinnacle. CRG is owned by Father and Jeff and Julian Cornett, Father's prior business partners at Pinnacle. Father paid approximately $16,000.00 for his one-third interest in CRG but testified that he sold his interest for $23,500.00, which funds he used to pay off the parties' home equity line of credit.

Father also testified as to his interest in Whole IT Solutions ("Whole IT"), Father's current business. Father first gained a one-third interest in Whole IT in 2003. Father testified that neither he nor the other two initial partners in Whole IT made any capital contributions to the company. Indeed, for several years the company made no income. After he left Pinnacle in 2013, Father gained a one-hundred percent interest in Whole IT and began working there full-time. Father testified that when he took control of Whole IT, there was only one remaining partner whom Father did not pay for the relinquishment of his interest. Father testified, however, that he did deposit the proceeds from the sale of his Pinnacle interest into Whole IT. Father testified that he earns approximately $60,000.00 per year from his current employment.

Father also testified about the parties' debts and disputes Mother's classification of the parties' credit card debts. He denied Mother's testimony regarding the domestic violence and denied "ever intentionally slapping his wife." During trial, he stated that he was living in his van when he was not caring for the children.

The trial court issued its over forty page written ruling on April 18, 2015. In its ruling, the trial court made detailed findings with regard to Father's lack of credibility, citing Father's vague, inconsistent, and often evasive answers to questions. In contrast, the trial court found that Mother's testimony was consistent and credible. The trial court granted Mother a divorce on the ground of inappropriate marital conduct and designated Mother primary residential parent of the children. Father was awarded weekly visitation with the children. The trial court also divided the parties' marital property, awarding

Mother the marital residence and accompanying debt based upon her valuation of the property. Since Father offered no documents to support his claim that he retained only an approximate 25% interest in Pinnacle at the time he purportedly sold his interest, the trial court set Father's share of Pinnacle at 40%. The trial court further found that with regard to Father's interest in Pinnacle, Father was either concealing his interest or had dissipated his interest in anticipation of divorce. Because the trial court found that no credible evidence had been submitted regarding Pinnacle's value in recent years, the trial court considered what it found to be the only competent evidence on this issue—that in 2005, Father and Jeff Cornett agreed to transfer 20% of Pinnacle to Julian Cornett for a revolving line of credit in the amount of $100,000.00—to value Father's 40% interest in Pinnacle at $200,000.00. Taking this value as well as the trial court's values of Father's other business interests, the trial court awarded Mother $169,000.00 in alimony in solido to equalize the parties' property division.

The trial court also found that Father was voluntarily underemployed and/or engaged in a scheme to lower his income for divorce purposes and therefore considered Father's tax returns and other financial documents from 2010 to 2014 to set Father's earning capacity at between $100,000.00 and $110,000.00 per year. Father's child support obligation was determined to be $2,056.00 per month based on an income of $100,000.00 per year. After considering several factors, including Father's ability to pay, Mother's need, and Mother's role as caregiver during the parties' marriage, the trial court awarded Mother rehabilitative alimony of $2,500.00 per month for 180 months, or 15 years. The trial court also awarded Mother $42,901.50 in attorney's fees. The trial court later awarded Mother discretionary costs and an additional $3,000.00 in attorney's fees in contemplation of this appeal.

## Issues Presented

Father raises several issues in his appellate brief, which we have slightly restated and reordered as follows:

1. Whether the trial court erred in applying Tennessee Code Annotated Section 36-6-106(a) by failing to maximize the participation of Father in the lives of the children and erred in ordering a permanent parenting plan that did not serve the children's best interest.
2. Whether the trial court erred in awarding Mother an alimony in solido judgment in the amount of $169,000.00 as "an equitable division of marital assets and liabilities."
3. Whether the trial court erred in granting all equity in the marital residence to Mother and failing to make an equitable distribution of the parties' assets and debts.

4. Whether the trial court erred in calculating Father's income for child support purposes.
5. Whether the trial court erred in the amount and duration of alimony awarded to Mother and erred in requiring Father to insure the alimony obligation in the amount of $350,000.00 (via life insurance policy).
6. Whether the trial court erred in granting Mother all of her attorney's fees, discretionary costs, and a post-trial award of attorney's fees for appeal.

In the posture of Appellee, Mother also seeks an award of attorney's fees on appeal.

**Discussion**

**Parenting Plan**

Father first argues that the trial court erred in awarding Mother significantly more time with the children. Here, the trial court named Mother primary residential parent of the children and awarded her 265 days and Father 110 days,[4] consisting of every other weekend and two hours every Wednesday evening.

Because this case was tried by the court, sitting without a jury, we review the factual issues de novo upon the record with a presumption of correctness. Tenn. R.App. P. 13(d). Unless the evidence preponderates against the trial court's findings, we must affirm, absent error of law. *Id.* In order for the evidence to preponderate against the trial court's findings, it must support another finding of fact with greater convincing effect. *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000).

In applying the de novo standard, we are mindful that "[t]rial courts are vested with wide discretion in matters of child custody and that the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion." *Aragon v. Aragon*, No. M2013-01962-COA-R3-CV, 2014 WL 1607350, at *3–5 (Tenn. Ct. App. Apr. 21, 2014) (quoting *Hyde v. Amanda Bradley*, No. M2009-02117-COA-R3-JV, 2010 WL 4024905, at *3 (Tenn. Ct. App. Oct. 12, 2010)). Because "[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during . . . proceedings," appellate courts "are reluctant to second-guess a trial court's decisions." *Hyde*, 2010 WL 4024905, at *3. Accordingly, appellate courts review a trial court's decision regarding which parent to name as the primary residential parent

---

[4] Both parties admit that this award involves a mathematical error. The parties shall abide by the schedule of days contained in the permanent parenting plan, rather than the trial court's calculation of days.

for an abuse of discretion. *See* **Fulbright v. Fulbright**, 64 S.W.3d 359, 365 (Tenn. Ct. App. 2001) (citation omitted); *see also* **Porter v. Porter**, No. M2012-00148-COA-R3-CV, 2013 WL 313838, at \*14 (Tenn. Ct. App. 2013) (Kirby, J., concurring) (declining to reverse the trial court's ruling only because of the "high standard" required under abuse of discretion review). "[A] trial court's decision regarding custody or visitation should be set aside only when it 'falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.'" **Curtis v. Hill**, 215 S.W.3d 836, 839 (Tenn. Ct. App. 2006) (quoting **Eldridge v. Eldridge**, 42 S.W.3d 82, 88 (Tenn. 2001)). Thus, it is not within the province of appellate courts to tweak a parenting plan in hopes of achieving a better result than the trial court. *See* **Eldridge**, 42 S.W.3d at 88. As our Supreme Court has explained:

> When no error in the trial court's ruling is evident from the record, the trial court's ruling must stand. This maxim has special significance in cases reviewed under the abuse of discretion standard. The abuse of discretion standard recognizes that the trial court is in a better position than the appellate court to make certain judgments. The abuse of discretion standard does not require a trial court to render an ideal order, even in matters involving [parental responsibilities], to withstand reversal. Reversal should not result simply because the appellate court found a "better" resolution. *See* **State v. Franklin**, 714 S.W.2d 252, 258 (Tenn. 1986) ("appellate court should not redetermine in retrospect and on a cold record how the case could have been better tried"); *cf.* **State v. Pappas**, 754 S.W.2d 620, 625 (Tenn. Crim. App.1987) (affirming trial court's ruling under abuse of discretion standard while noting that action contrary to action taken by the trial court was the better practice); **Bradford v. Bradford**, 51 Tenn. App. 101, 364 S.W.2d 509, 512–13 (1962) (same). An abuse of discretion can be found only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record. *See, e.g.,* **State ex. rel Vaughn v. Kaatrude**, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000).

**Eldridge**, 42 S.W.3d at 88. The trial court's discretion, however, is not unbounded. **Hogue**, 147 S.W.3d at 251.The court must base its decision upon proof and apply the appropriate legal principles. ***Id.***

Tennessee Code Annotated Section 36-6-106(a) provides Tennessee courts with a

non-exclusive list of factors to be considered when fashioning a residential schedule for a child. In addition, Section 36-6-106(a) states that a court fashioning a parenting plan "shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with" the child's best interest. Here, the trial court made an exhaustive review of the various applicable factors. First, the trial court found that Mother served as the primary caregiver for the children. *See* Tenn. Code Ann. § 36-6-106(a)(5) (involving the "degree to which a parent has been the primary caregiver"). The trial court also found that Mother exhibited a willingness to encourage a relationship between the children and Father. *See* Tenn. Code Ann. § 36-6-106(a)(1) (involving "the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents"). The trial court also considered Mother's involvement and emotional bond with the children, which the trial court characterized as greater than that between Father and the children. *See* Tenn. Code Ann. § 36-6-106(a)(1) (involving the "strength, nature, and stability of the child's relationship with each parent"). Finally, the trial court considered the substantial evidence regarding Father's emotionally and sometimes physically abusive behavior. *See* Tenn. Code Ann. § 36-6-106(a)(11) (involving physical or emotional abuse to the child or parent). Considering all these factors, the trial court found that they all strongly weighed in favor of naming Mother primary residential parent and allowing her substantially more time with the children. Father argues that the trial court placed improper weight on certain factors and certain evidence, including the testimony of the parties' eldest child. Father therefore argues that the trial court should have entered a parenting plan giving Father more time with the children.

Respectfully, we do not agree. Here, although we cannot fault Father for his dedication to his work and providing for the family, there can be no genuine dispute that Mother is the children's primary caregiver, as Father's role as income earner often made him unavailable. Furthermore, the evidence in the record shows that at the time of trial Father had no stable home. Instead, when the children visited him overnight, three of the children were required to sleep in one room of Father's parents' home with him, while the parties' oldest child slept on a mattress on the floor in grandparents' office. In contrast, Mother was awarded the marital residence where the children resided prior to and throughout the divorce proceedings. The issue of the children's stability, therefore, weighs in favor of naming Mother primary residential parent of the children. *See* Tenn. Code Ann. § 36-6-106(a) (indicating that a best interest findings must take into account "the child's need for stability"). The trial court also took issue with Father's treatment of Mother and his decision to smoke cigarettes around the children, facts that are fully supported by the evidence in the record. Additionally, in his brief, Father does not set forth a parenting schedule that would better serve the children's interests, instead simply asking that this Court remand to the trial court so that Father be awarded "more time with the children." Under these circumstances, we cannot fault the trial court for awarding

Father only every other weekend and Wednesday night visitation with the children.

## Marital Property

Father next takes issue with the trial court's marital property award, specifically the award of $169,000.00 in alimony in solido as "an equitable division of marital assets and liabilities" and in failing to make a more equitable division of the parties' assets and debts. According to Father, the trial court's alimony in solido award is based upon the improper valuation of Father's interests in Pinnacle, Whole IT, and CRG. Furthermore, Father contends that the trial court erred in its valuation of the marital residence and in its division of the marital property.

As must be obvious from the above paragraph, Father's arguments concern issues of marital property, including its valuation and division. Rule 7 of Rules of the Court of Appeals of Tennessee provides:

> **(a)** In any domestic relations appeal in which either party takes issue with the classification of property or debt or with the manner in which the trial court divided or allocated the marital property or debt, the brief of the party raising the issue shall contain, in the statement of facts or in an appendix, a table in a form substantially similar to the form attached hereto. This table shall list all property and debts considered by the trial court, including: (1) all separate property, (2) all marital property, and (3) all separate and marital debts.
> **(b)** Each entry in the table must include a citation to the record where each party's evidence regarding the classification or valuation of the property or debt can be found and a citation to the record where the trial court's decision regarding the classification, valuation, division, or allocation of the property or debt can be found.

Basically, "in all cases where a party takes issue with the classification and division of marital property, the party must include in its brief a chart displaying the property values proposed by both parties, the value assigned by the trial court, and the party to whom the trial court awarded the property." *Akard v. Akard*, No. E2013-00818-COA-R3-CV, 2014 WL 6640294, at *4 (Tenn. Ct. App. Nov. 25, 2014).

This Court has repeatedly held that the failure to comply with Rule 7 results in waiver of "all issues relating to the rule's requirements." *Forbess v. Forbess*, 370 S.W.3d 347, 354 (Tenn. Ct. App. 2011) (quoting *Harden v. Harden*, No. M2009-01302-COA-R3-CV, 2010 WL 2612688, at *8 (Tenn. Ct. App. June 30, 2010) (citation omitted)); *see*

*also* ***Akard***, 2014 WL 6640294, at \*4–5; ***Rountree v. Rountree***, 369 S.W.3d 122, 133 n.7 (Tenn. Ct. App. 2012); ***Townsend v. Townsend***, No. W2004-02034-COA-R3-CV, 2005 WL 3416310, at \*6 (Tenn. Ct. App. Dec. 14, 2005); ***Spurgeon v. Spurgeon***, No. M2004-00028-COA-R3-CV, 2005 WL 1390067, at \*2 (Tenn. Ct. App. June 13, 2005); ***Durant v. Durant***, No. M2001-00691-COA-R3-CV, 2002 WL 772923, at \*3 (Tenn. Ct. App. Apr. 30, 2002). As we have previously explained:

> [I]t is essential that the parties comply with Rule 7 in order to aid this Court in reviewing the trial court's decision. The table required by Rule 7, allows this Court to easily and correctly determine the valuation and distribution of the marital estate as ordered by the trial court. Further, the Rule 7 table, allows this Court to ascertain the contentions of each party as to the correct valuations and proper distribution, as well as the evidence in the record which the party believes supports its contention. Consequently, a table, in full compliance with Rule 7, is vital as this Court must consider the entire distribution of property in order to determine whether the trial court erred. Moreover, this Court is under no duty to minutely search the record for evidence that the trial court's valuations may be incorrect or that the distribution may be improper.

***Harden***, 2010 WL 2612688, at \*8.

Here, Father's arguments concerning the award of alimony in solido and the equitable division on the parties' marital property clearly involve the valuation, classification, and allocation of the parties' assets and debts. Father's brief, however, fails to contain any Rule 7 chart, much less one fully in compliance with Rule 7's requirements. Although we may suspend the requirements of Rule 7 for "good cause[,]" *see* Tenn. R. Ct. App. 1(b), we discern no such cause to do so in this case. In the absence of any Rule 7 chart, we decline to consider Father's issues that concern the valuation and allocation of the parties' marital property.

## Child Support

Father next argues that the trial court erred in finding that Father is voluntarily underemployed and in setting his income for child support purposes as $100,000.00. Father asserts that his testimony clearly shows that he currently earns only $60,000.00 from his employment with Whole IT, and that, therefore, there is no "need to impute income" to Father.

The initial determination of a child support order is governed by Tennessee Code

Annotated Section 36-5-101. Tennessee Code Annotated Section 36-05-101(e)(1)(A) instructs the trial court to apply the child support guidelines, as set forth in the rules and regulations of the Department of Human Services, as a rebuttable presumption in determining the amount of child support. *See* Tenn. Comp. R. & Regs. § 1240-02-04-.01. Even with the adoption of the child support guidelines, trial courts retain a certain amount of discretion in their decisions regarding child support, which decisions we review under an abuse of discretion standard. ***Richardson v. Spano***, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005). A trial court abuses its discretion when it has applied an incorrect legal standard or has reached a decision which is against logic or reasoning that caused an injustice to the party complaining. ***Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn. 2001). We likewise review a trial court's decision with respect to whether a deviation from the child support guidelines is warranted under the abuse of discretion standard. ***In re Chase B.S.,*** No. W2011-02334-COA-R3-JV, 2012 WL 5990226, at *8 (Tenn. Ct. App. Nov. 30, 2012). The trial court's discretionary decision to deviate from the child support guidelines must nevertheless "take into consideration the applicable law and the relevant facts." ***Id.*** (citing ***Reeder v. Reeder***, 375 S.W.3d 268, 275 (Tenn. Ct. App. 2012)).

"The fairness of a child support award depends on an accurate determination of both parents' gross income or ability to support." ***Massey v. Casals***, 315 S.W.3d 788, 795 (Tenn. Ct. App. 2009). In most cases, a parent's earning capacity or ability to earn income is equivalent to the parent's gross income. ***Id.*** Under the Child Support Guidelines, the trial court may impute income under certain limited circumstances. *See* ***Goodman v. Goodman***, No. W2011-01971-COA-R3-CV, 2012 WL 1605164, at *4 (Tenn. Ct. App. May 7, 2012); *see also* Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(i)(I–III). The ***Goodman*** Court explained:

> [T]he Guidelines provide that: "[i]mputing additional gross income to a parent is appropriate . . . [i]f a parent has been determined by a tribunal to be willfully and/or voluntarily underemployed or unemployed." Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(2)(i). However, to trigger this portion of the child support guidelines and "[t]o calculate a child support award based on earning capacity rather than actual net income, there must be a threshold finding that the obligor parent is willfully and voluntarily underemployed or unemployed." ***Marcus v. Marcus***, No. 02A01-9611-CV-00286, 1998 WL 29645, at *3 (Tenn. Ct. App. Jan. 28, 1998) (emphasis added); *see also* ***Kendle v. Kendle***, No. M2010–00757-COA-R3-CV, 2011 WL 1642503, at *3 (Tenn. Ct. App. April 28, 2011) (citing Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(2)(i)(I)).

***Goodman***, 2012 WL 1605164, at *4.

The determination of whether a parent is voluntarily underemployed is a question of fact, which "requires careful consideration of all the attendant circumstances." ***Richardson v. Spanos***, 189 S.W.3d 720, 726 (Tenn.Ct.App.2005) (citing ***Eldridge v. Eldridge***, 137 S.W.3d 1, 21 (Tenn.Ct.App.2002); ***Willis v. Willis***, 62 S.W.3d 735, 738–39 (Tenn. Ct. App. 2001)). Such a determination "may be based on any intentional choice or act that adversely affects a parent's income." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii)(I). As explained by this Court:

> When called upon to determine whether a parent is willfully and voluntarily unemployed or underemployed, the courts will consider the factors in Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(d)(2), as well as the reasons for the party's change in employment. ***Demers v. Demers***, 149 S.W.3d 61, 69 (Tenn. Ct. App. 2003); ***Eldridge v. Eldridge***, 137 S.W.3d 1, 21 (Tenn. Ct. App. 2002). If a parent's reasons for working in a lower paying job are reasonable and in good faith, the court will not find him or her to be willfully and voluntarily underemployed. ***Willis v. Willis***, 62 S.W.3d at 738. The courts are particularly interested in whether a parent's change in employment [or amount of income] is voluntary or involuntary, ***Eldridge v. Eldridge***, 137 S.W.3d at 21, and are more inclined to find willful and voluntary underemployment when a decision to accept a lower paying job is voluntary. ***Demers v. Demers***, 149 S.W.3d at 69.

***Richardson***, 189 S.W.3d at 726.

Father argues that the evidence in the record preponderates against the trial court's finding that he was willfully and voluntarily underemployed because the reduction of his income was neither voluntary nor willful. Here the evidence shows that Father left his employment with Pinnacle in September 2013. According to Father, at the time he left Pinnacle, he was earning only $60,000.00 per year. Father testified that he decided to leave Pinnacle because he "was not pulling my weight [and] was becoming a detriment" to the company. Father also testified that the termination of his employment with Pinnacle resulted from him being unable to make sufficient sales to cover his base salary, in contrast to prior years where he earned a base salary and commissions. Finally, Father testified that he currently earns $60,000.00 from various employment sources.

Here, the trial court found that Father was voluntarily underemployed and had reduced his income in anticipation of divorce. Specifically, the trial court found:

25. [Father] currently is willfully and voluntarily underemployed and has engaged in a scheme or effort to dissipate marital assets and deprive [Mother] of her equitable share in his assets and earnings.

26. [Father's] earnings were on the rise when he chose to relinquish his interest in Pinnacle [] and CRG and to create an appearance of disassociation from Jeff Cornett and Pinnacle []. Apparently, Pinnacle [] and CRG were also doing well financially, as shown by the proof at trial. The Court is of the opinion that [Father's] choices were solely for divorce planning to reduce his future obligations to [Mother], whether it be in sharing marital property, paying alimony or paying child support.

27. [Father] testified that a salary with Whole IT [] began September 1, 2013, and is $60,000 per year. However, [Father's] own 2013 - 2014 profit and loss statements from Whole IT, introduced as Collective Exhibit 23, shows that Whole IT also directly pays expenses for [Father]'s personal benefits such as: meals and entertainment, charitable expenses, payroll processing, payroll taxes, health insurance, other purchases and miscellaneous expenses. These benefits were summarized by [Mother's] Exhibit 22, which corresponds to the items listed on the Whole IT's profit and loss statement. These expenses for [Father's] benefit paid directly by Whole IT amount to $7,195.62 for the last four (4) months (September — December) of 2013, and $27,750.44 for all of 2014. [Father] is the 100% owner of Whole IT. These expenses paid for [Father] by Whole IT, should be added to [Father's] $60,000 salary. As a result, the Court concludes that [Father's] total income and benefits earned from employment in 2014 was $87,750.44.

28. [Father] had "variable components of income" justifying an averaging method to determine his monthly income for child support purposes. [Father]'s earnings have included bonuses, commissions, rentals and other sources of income in addition to a fixed salary. Using a four (4) year average, 2011 — 2014, and taking into consideration all the evidence, including deposits of income [Father] has made into his account, the Court concludes that [Father]'s monthly gross income for child support purposes should be set at least at $8,333.33 per month, or at least $100,000 annually.

Thus, the trial court considered both the personal expenses paid by Father's company and an average of Father's income from all sources as shown by his profit and loss statements from 2011 to 2014 to set Father's income for child support purposes at $100.000.00 per year.

Often, the determination of gross income or net income is based on a relatively invariable income, such as a salary. Where, however, the obligor parent's income is subject to variation, averaging is appropriate to determine net income for the purpose of calculating child support. *Alexander v. Alexander*, 34 S.W.3d 456, 460 (Tenn. Ct. App. 2000). The guidelines specifically allow averaging in determining gross income when establishing a prospective award: "[v]ariable income such as commissions, bonuses, overtime pay, and dividends, etc., should be averaged and added to the obligor's fixed salary." Tenn. Comp. R. and Regs. 1240-02-04-.03(3)(b). "Although that provision of the guidelines applies to variable components of income, the reasoning is just as applicable to situations where a parent is self-employed or whose total income is variable." *Smith v. Smith*, No. M2000-01094-COA-R3-CV, 2001 WL 459108, at *5 (Tenn. Ct. App. May 2, 2001).

Although Father does not dispute that his reported income has decreased in recent years, he asserts that any reduction is due to market issues, rather than an effort to manipulate his income for divorce purposes. With regard to Father's departure from Pinnacle, Father contends that this decision was based upon the decline of the company and the industry and insinuates that he had no choice in the matter. The trial court did not credit Father's testimony, instead finding that both Father and Pinnacle were doing well financially when Father chose to leave. Where the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary. *Franklin County Bd. Of Educ. v. Crabtree*, 337 S.W.3d 808, 811 (Tenn. Ct. App. 2010) (citing *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002)). Instead, the trial judge who has the opportunity to observe the manner and demeanor of the witnesses while testifying is typically in a far better position than this Court to decide those issues. *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (citing *Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013)). A thorough review of the record supports the trial court's credibility findings against Father. Especially with regard to financial matters, Father's answers to questions were often vague or evasive. Furthermore, Father admitted to previously filing misleading financial documents concerning his interests in CRG and Pinnacle, although Father asserted that these errors were not intentional. As such, no clear and convincing evidence exists to overturn the trial court's unequivocal credibility findings against Father.

Given that the trial court did not credit Father's testimony, we cannot conclude

that the evidence in the record preponderates against the trial court's finding that Father was willfully and voluntarily underemployed. Here, the testimony shows that Father left his employment with Pinnacle on his own volition—absolutely nothing in the record suggests that he was forced out of Pinnacle or asked to resign by the company's other members. Furthermore, Mother testified that Father was contemplating divorce far before she filed her divorce complaint. Around the same time, Father sold his interest in Pinnacle and left his employment there under the guise of the declining performance of Pinnacle, despite the fact that Pinnacle's corporate tax returns show ever increasing gross profits from 2009 to 2012. Furthermore, Father admitted that, although he runs his own company now, he testified at his deposition that he does not advertise this business. The Tennessee Supreme Court has recognized that self-employed parents have "the opportunity 'to manipulate [their] reported income by either failing to aggressively solicit business or by inflating [their] expenses, thereby minimizing . . . income.'" *Taylor v. Fezell*, 158 S.W.3d 352, 358 (Tenn. 2005) (quoting *Mitts v. Mitts*, 39 S.W.3d 142, 148 (Tenn. Ct. App. 2000)). Under these circumstances, the trial court did not err in finding Father willfully and voluntarily underemployed and imputing income to Father.

Father also takes issue with the amount of income that the trial court imputed to him. According to Father, the trial court improperly considered "the sale of . . . assets which had the effect of skewing the previous year's apparent earnings," as those sales "were one-time events [that] do not properly reflect continuing income." Father cites no law to support his assertion that the trial court erred in considering the income that Father earned from the sale of his assets. From our review of the record as a whole, we find no abuse of discretion in the trial court's calculation of Father's income based upon an exhibit prepared by Mother showing the deposits into the parties' joint bank account attributable to Father.[5]

Here, the evidence that Father presented on his income was rather dubious. According to his brief, Father "testified at trial that the highest salary he has ever earned is $82,500.00." While Father's base income may never have topped this amount, the evidence in the record shows that he was earning substantially more than $82,500.00 per year, including both base salary and bonuses. *See* Tenn. Comp. R. and Regs. 1240-02-04-.04(3)(a)(1)(v) (specifically including bonuses as gross income for child support purposes). In 2012, the year he left Pinnacle because of its purported decline, however, Father represented in a personal financial statement with Pinnacle Bank that he made $100,520.00 annually in salary and bonuses. Indeed, despite Father's assertion throughout trial that his base salary consisted only of $60,000.00 in 2012, this document

_____

[5] Father does not assert in his appellate brief that the trial court's calculation improperly includes income earned by Mother, as she began her employment in 2013. Mother testified that in calculating Father's income from the parties' bank account deposits, she subtracted any deposits that represented money she received from work or from a car accident settlement.

- 15 -

states that Father's base salary at this time was $80,520.00. Furthermore, pursuant to this document, Father was earning more at Pinnacle in 2012 than he had in previous years. For example, in 2010, Father's personal financial statement indicated earnings at $92,500.00 in salary and bonuses, still well above $82,500.00. Likewise in both 2008 and 2009, Father represented that his income consisted of $72,500 in salary and $27,000.00 in bonuses, totaling $99,500.00. All of these statements were sworn to by Father under penalty of perjury. Additionally, while Father takes issue with the trial court's calculation of his income from the money deposited into the parties' bank account on the assumption that those deposits included the sale of assets, including the sale of Father's interest in Pinnacle, at trial Father claimed that the proceeds from the sale of his interest in Pinnacle "w[ere] deposited in Whole IT" rather than the parties' bank account.

Given the obvious inconsistencies between Father's testimony and his sworn statements made prior to the divorce, as well as his own contradictions at trial, the trial court was well within its discretion to disregard Father's testimony and consider other evidence in calculating Father's income. Moreover, because of Father's lack of forthrightness and refusal to fully cooperate in discovery, we cannot fault the trial court for utilizing the exhibit prepared by Mother showing the money flowing into the parties' bank account attributable to Father in calculating Father's income, despite Father's argument that such calculation improperly included one-time payments. Indeed, Father does not argue on appeal that Mother's exhibit is an inaccurate representation of the money deposited into the account by Father during the relevant years, only that those deposits should not all be considered income for child support purposes. When considering the monthly deposits into the parties' marital account for the years 2011 to 2014, as well as later personal expenses apparently paid by Whole IT for Father,[6] Father's income averages nearly $110,000.00. The trial court therefore rounded in Father's favor in setting his income at $100,000.00 per year for child support purposes. The trial court's ruling that Father's income would be set at $100,000.00 for purposes of child support is therefore affirmed.

## Alimony

Father next argues that the trial court erred in awarding Mother rehabilitative alimony for fifteen years in the amount of $2,500.00 per month. The standard of review applicable in alimony cases was thoroughly considered in the Tennessee Supreme Court's Opinion in *Gonsewski v. Gonsewski*, 350 S.W.3d 99 (Tenn. 2011):

> [T]his Court repeatedly and recently observ[ed] that trial courts have broad discretion to determine whether

---

[6] Father raises no argument in his brief and cites no law to suggest that the trial court was not within its discretion to consider the personal expenses paid by Father's company.

spousal support is needed and, if so, the nature, amount, and duration of the award. *See, e.g.,* ***Bratton v. Bratton***, 136 S.W.3d 595, 605 (Tenn. 2004); ***Burlew v. Burlew***, 40 S.W.3d 465, 470 (Tenn.2001); ***Crabtree v. Crabtree***, 16 S.W.3d 356, 360 (Tenn.2000).

Equally well-established is the proposition that a trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. ***Kinard v. Kinard***, 986 S.W.2d 220, 235 (Tenn. Ct. App. 1998); *see also* ***Burlew***, 40 S.W.3d at 470; ***Robertson v. Robertson***, 76 S.W.3d 337, 340–41 (Tenn. 2002). As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." ***Kinard***, 986 S.W.2d at 234. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." ***Broadbent v. Broadbent***, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. ***Robertson***, 76 S.W.3d at 343. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. ***Wright ex rel. Wright v. Wright***, 337 S.W.3d 166, 176 (Tenn. 2011); ***Henderson v. SAIA, Inc.***, 318 S.W.3d 328, 335 (Tenn. 2010). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" ***Henderson***, 318 S.W.3d at 335 (quoting ***Lee Medical, Inc. v. Beecher***, 312 S.W.3d 515, 524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision. ***Wright***, 337 S.W.3d at 176; ***Henderson***, 318 S.W.3d at 335.

***Gonsewski***, 350 S.W.3d at 105–06 (footnote omitted).

Currently, Tennessee law recognizes four types of spousal support: "(1) alimony in futuro, (2) alimony in solido, (3) rehabilitative alimony, and (4) transitional alimony." *Gonsewski*, 350 S.W.3d at 107 (citing Tenn. Code Ann. § 36-5-121(d)(1)). In this case, the trial court awarded Mother fifteen years of rehabilitative alimony. Rehabilitative alimony is alimony "intended to assist an economically disadvantaged spouse in acquiring additional education or training which will enable the spouse to achieve a standard of living comparable to the standard of living that existed during the marriage or the post-divorce standard of living expected to be available to the other spouse." *Id.* at 108 (citing Tenn. Code Ann. § 36-5-121(e)(1)).

Father first argues that the trial court erred in setting Father's income for alimony purposes. We have previously affirmed the trial court's finding that Father is willfully and voluntarily underemployed as well as its calculation of Father's income based upon an average of his deposits in the marital account in the years prior to the divorce for child support purposes.[7] For the same reasons, we also affirm the trial court's calculation of Father's income at between $100,000.00 and $110,000.00 for alimony purposes.

Father next argues that the trial court did not properly consider the factors outlined in Tennessee Code Annotated Section 36-5-121(i) in awarding Mother alimony. In order to determine whether to award alimony and, if so, the amount and duration of the award, the court is directed to consider several factors, including the age, mental condition, and physical health of the parties, the length of the marriage, the parties' relative earning capacities, the separate assets of the parties, the provisions made with regard to marital property, and the standard of living the parties' enjoyed during the marriage. *See* Tenn. Code Ann. § 36-5-121(i). Although the trial court should consider all relevant factors, "the two that are considered the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay." *Gonsewski*, 350 S.W.3d at 110 (quoting *Riggs*, 250 S.W.3d at 457); *see also* *Bratton*, 136 S.W.3d at 605; *Robertson*, 76 S.W.3d at 342; *Burlew*, 40 S.W.3d at 470.

Here, the trial court made detailed findings of fact with regard to many of the Section 36-5-121(i) factors:

> 245. Under Tennessee Code Annotated 36-5-121(i), the first factor being, the relative earning capacity, obligations, needs and financial resources of each party, including income from pension, profit sharing, retirement

---

[7] In his brief, Father suggests that the trial court did not make a finding that he was willfully and voluntarily underemployed for alimony purposes. The trial court's finding of willful and voluntary underemployment is not limited only to the issue of child support. This argument is unavailing.

plans and other sources, the Court has considered the relative earning capacity of both the [Mother] and the [Father]. The [Mother]'s earning capacity is what it is right now. The [Father]'s earning capacity is based on what the Court stated in the findings of fact and conclusions, the obligations being based upon what has been submitted with regard to the obligations to pay for the revolving debt that has been accumulated. In addition, the average monthly obligations of both [Father] and [Mother] individually after the divorce, considering the financial resources of each party, have been considered.

246. Pertaining to the relative education and training of each party, [Father] has a high school education but has technical training in the real world outside of his education. The Court credits [Father] for that. He has a good knowledge of the basics as well as other technical knowledge in regards to his particular field, and has demonstrated an ability to do well financially, based upon the findings of fact and conclusions the Court previously made.

247. It is the Court's understanding that [Mother] wishes to secure additional education and training, with a secondary education, major in mathematics. The Court believes that for [Mother] to increase her earning capacity that additional education and training is reasonable, and that in the furthering of her education and training [Mother] will have the ability to increase her earning capacity.

248. The Court has considered the duration of the marriage, the age and mental condition of each party, and finds the mental condition of both parties to be sufficient and that neither party has any mental condition that prevents them from being employable in whatever they want to do.

249. There is no evidence that either party has a physical condition or malady that prevents them from being employed in a field they so choose and the Court finds there is no physical disability or mental or physical incapacity due to any chronic or disabling disease that would prevent either party from being employed in the future.

250. The Court has considered the extent to which it would be undesirable for a party to seek employment outside of the home, because such party will be a custodian of the minor children of the marriage. The Court credits [Mother] for her full-time job at home taking care of four (4) children, yet she

has made the decision to organize her life so she can increase her earning capacity and enjoy employment outside of the home. The Court credits [Mother] for that. Simply put, it takes a lot of guts. [Mother] has a full-time job at home and a job outside of the home, and the Court applauds her for doing a great job.

251. The Court has considered the separate assets of each party, both real, personal, tangible and intangible, and they are insignificant based on the proof.

252. The Court has considered provisions with regard to the division of marital property. The Court does not find there is any liquidity in the marital property to amount to anything, nor is there any other assets that would allow the Court to draw alimony in solido at this time.

253. The Court has considered the standard of living of the parties established during the marriage. The Court finds their standard of living was mediocre, or average.

254. The Court has considered the extent to which each party made such tangible and intangible contributions to the marriage, as monetary and homemaker contributions, and further tangible and intangible contributions by the parties, and the education, training or increased earning power of the other party. First, the Court finds that [Mother] made significant tangible and intangible contributions to the marriage, including contributions as a homemaker, primary caretaker, and trying to keep the marriage together for the benefit of the parties' children, despite the fact she was ridiculed and treated poorly by the [Father]. The Court also finds that neither party made any tangible or intangible contributions to the marriage or in the tangible or intangible contributions by either one to the education, training or increased earning capacity of the other. In fact, the proof shows the [Father] did just the opposite.

255. The Court finds from the facts of the case, considering the [Mother]'s age and her station in life and all of the other factors the Court has considered under the statutes, that she is a candidate for rehabilitative alimony. The Court considered [Mother]'s age, her health, her tenacity, her positive outlook on life, and believes she is a candidate to be rehabilitated. However, the Court recognizes that if for whatever reason rehabilitation is frustrated or there is additional time that may be needed or that it is impossible for whatever reason that

comes along later the Court retains jurisdiction to modify or transform rehabilitative into alimony in futuro or additional rehabilitative alimony or some other remedy if the purpose of rehabilitation has been frustrated through no fault of her own.

We find no abuse of discretion in the trial court's finding that Mother is a candidate for rehabilitative alimony. Father's imputed income, as found by the trial court and affirmed by this Court, is far more than Mother's current earning capacity. *See* Tenn. Code Ann. § 36-5-121(i)(1) (directing the court to consider the relative earning capacity of the parties). The evidence in the record suggests that while Father pursued his career on behalf of the family, Mother's contributions to the marriage were made in the home. *See* Tenn. Code Ann. § 36-5-121(i)(10) (directing the court to consider whether one party made intangible contributions to the family as a homemaker). With the demise of the marriage, however, Mother is now disadvantaged relative to Father with regard to her ability to earn income. We also agree that Mother's plan to obtain a college education is appropriate, given her nearly full-time employment and four children. *See* Tenn. Code Ann. § 36-5-121(i)(2) (directing the court to consider the relative education and training of the parties and the necessity for either party to obtain more training to increase his or her earning capacity). Nothing in Father's brief appears to take issue with Mother's expenses, which show that she has a $6,420.66 shortfall per month. Including the $2,056.00 child support award that Father is obligated to pay Mother, she still has a shortfall of over $4,000.00 per month. Thus, Mother clearly has the need for alimony. *See* Tenn. Code Ann. § 36-5-121(i)(1) (directing the court to consider the needs and financial resources of the parties).

We cannot agree with all of the trial court's findings, however. First, we note that despite the trial court's finding that alimony in solido could not be awarded due to the lack of liquid assets, the trial court did actually award Mother substantial alimony in solido to equalize the parties' marital property. Still, we do not subscribe to Father's contention that he was awarded substantially less marital property in the divorce, making alimony wholly inappropriate; the trial court found that Father had substantial remaining interests in several companies that he refused to value or disclose and all issues with regard to marital property have been affirmed on the basis of waiver. *See* Tenn. Code Ann. § 36-5-121(i)(8) (directing the court to consider the provisions made with regard to marital property).

We do agree with Father's assertion, however, that the fifteen year duration of the alimony awarded is excessive. Here, the parties were married for fourteen years. *See* Tenn. Code Ann. § 36-5-121(i)(4) (directing the court to consider the duration of the marriage). Furthermore, Mother appears to be in good health both mentally and physically. *See* Tenn. Code Ann. § 36-5-121(i)(3) (directing the court to consider the age and mental condition of the parties). Most importantly, Mother testified that she would be

able to earn her degree in eight years attending classes part-time. A thorough review of Mother's testimony reveals absolutely no basis for an alimony duration that is nearly twice as long as it will take Mother to complete her education and longer than the parties' marriage. With regard to transitional alimony, which is similar to rehabilitative alimony other than the disadvantaged spouse's ability to be rehabilitated, this Court has previously noted that "this Court has affirmed an award of transitional alimony for a period of eight years at most." *Lunn v. Lunn*, No. E2014-00865-COA-R3-CV, 2015 WL 4187344, at \*10 (Tenn. Ct. App. June 29, 2015) (citing *Miller v. McFarland*, No. M2013-00381-COA-R3-CV, 2014 WL 2194382 at \*8 (Tenn. Ct. App. May 23, 2014) (holding that a period of eight years is not an unreasonable duration for an award of transitional alimony); *Kelly v. Kelly*, No. E2012-02219-COA-R3-CV, 2013 WL 4007832 at \*12 (Tenn. Ct. App. Aug. 6, 2013), *rev'd in part* 445 S.W.3d 685 (Tenn.2014) (modifying award to transitional alimony of eight years' duration); *Hatfield v. Hatfield*, No. M2012-00358-COA-R3-CV, 2013 WL 493305 at \*6 (Tenn. Ct. App. Feb. 7, 2013) (affirming award of alimony of $1,200.00 per month for five years, but modifying the designation of such alimony from alimony in futuro to transitional alimony); *Ghorashi–Bajestani v. Bajestani*, No. E2009-01585-COA-R3-CV, 2010 WL 3323743 at \*15 (Tenn. Ct. App. Aug. 24, 2010) (modifying nine-year transitional alimony award to period of six years, given that the parties were married only eight years); *Pearson v. Pearson*, No. E2007–02154-COA-R3-CV, 2008 WL 4735305 at \*13 (Tenn. Ct. App. Oct. 27, 2008) (affirming award of alimony of $1,500.00 per month for six years, but modifying the designation of such alimony from rehabilitative alimony to transitional alimony)). Under these circumstances, we direct the trial court that should Father have the ability to pay any alimony award on remand, as discussed *infra*, the award should extend no longer than Mother anticipates that she will need to achieve her educational goals, i.e., eight years.

Finally, we must also agree with Father that the evidence suggests that he simply does not have the ability to pay alimony in the amount awarded to Mother. *See* Tenn. Code Ann. § 36-5-121(i)(1). Here, even considering the uppermost figure used by the trial court to calculate Father's income, deducting his purported expenses and child support obligation, Father is left with only approximately $1,200.00 per month in surplus gross income before paying any alimony award. This Court has previously held that a trial court abuses its discretion in awarding alimony in an amount that a spouse "cannot realistically afford to make." *Woods v. Woods*, No. M2002-01736-COA-R3-CV, 2005 WL 1651787, at \*9 (Tenn. Ct. App. July 12, 2005). Here, the trial court found that Father had the ability to pay Mother $2,500.00 per month considering Father's expenses. It is unclear from the trial court's order, thorough though it may be, whether the trial court also considered Father's child support obligation or the tax consequences to the parties in making such an award. Under these circumstances, we vacate the award of $2,500.00 per month in alimony to Mother and remand for reconsideration of what, if any, of Mother's need for alimony Father has the ability to pay given his income of $110,000.00 per year. Given that many of Father's expenses were estimated at the time of

the divorce proceedings, the parties shall be permitted to introduce additional proof regarding expenses. The issue of Father's income for alimony purposes or the duration of the alimony obligation, however, may not be relitigated except as provided by Tennessee Code Annotated Section 36-5-121(e)(2).

## Attorney's Fees and Costs

Finally, Father argues that the trial court erred in awarding Mother all of her requested attorney's fees. Mother, of course, asserts that the trial court correctly ordered that Father be responsible for her attorney's fees due to his failure to comply with discovery and also asks that she be awarded her attorney's fees on appeal.

This state follows the firmly established American rule which provides that litigants are responsible for their own attorney's fees absent a statute or agreement between the parties providing otherwise. *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 194 (Tenn. 2000). In divorce proceedings, the recovery of attorney's fees by a litigant is provided for by statute which provides that a spouse seeking enforcement of an alimony or custody award in a decree may be granted attorney's fees in the discretion of the court before whom the action is pending. Tenn. Code. Ann. § 36-5-103(c). A trial court's decision regarding an award of attorney's fees is reviewed under an abuse of discretion standard and will only be reversed if the trial court abused its discretion. *Owens v. Owens*, 241 S.W.3d 478, 496 (Tenn. Ct. App. 2007) (citing *Aaron v. Aaron*, 909 S.W.2d 408, 411 (Tenn. 1995); *Eldridge v. Eldridge*, 137 S.W.3d 1, 25 (Tenn. Ct. App. 2002)). An award of attorney's fees usually takes the form of an award of alimony in solido. *Yount v. Yount*, 91 S.W.3d 777, 783 (Tenn. Ct. App. 2002) (citing *Storey v. Storey*, 835 S.W.2d 593 (Tenn. Ct. App. 1992)). "Accordingly, a trial court considering a request for attorney's fees must consider the factors contained in [Tennessee Code Annotated] § 36-5-121(i), with the most important factors being the need of the economically disadvantaged spouse and the ability of the obligor spouse to pay." *Owens*, 241 S.W.3d at 495–96 (citing *Eldridge*, 137 S.W.3d at 24–25; *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001)). "It is considered most appropriate where the final decree of divorce does not provide the obligee spouse with a source of funds, such as from property division or alimony in solido, with which to pay his or her attorney." *Yount*, 91 S.W.3d at 783 (citing *Houghland v. Houghland*, 844 S.W.2d 619 (Tenn. Ct. App. 1992)).

Here, Father argues that given the $169,000.00 awarded as alimony in solido, as well as the overall division of marital property, the alimony award, and Father's child support obligation, he has no ability to pay the awarded fees.[8] Mother, argues, however,

---

[8] It is not entirely clear from the record how likely it is that Mother will be able to enforce her judgment for alimony in solido. The trial court recognized in its order that Mother may be required to

- 23 -

that while ability to pay and need are factors in the consideration of attorney's fees awarded as alimony pursuant to a divorce, the attorney's fees in this case are also proper due to the child custody and support issues that were litigated by the parties. This Court has previously held that a parent's inability to pay fees may be a bar to recovery of attorney's fees with regard to litigation concerning alimony, but "not in regard to child custody and child support." *Dalton v. Dalton*, 858 S.W.2d 324, 327 (Tenn. Ct. App. 1993). This Court has also explained that "ability to pay should not be the controlling consideration with regard to awards for legal expenses in custody or support proceedings." *Sherrod v. Wix*, 849 S.W.2d 780, 785 (Tenn. Ct. App. 1992) (citing Tenn. Code Ann. § 36-5-103(c) (involving both fees associated with "the original divorce hearing" and "any subsequent hearing")). In *Sherrod*, the Court of Appeals concluded that an award of attorney's fees was appropriate despite the father's inability to pay because father's obsessive or harassing behavior "prolonged the proceedings and added significantly to their expense." *Id.*; *but see* *Foxx v. Bolden*, No. E2002-02831-COA-R3CV, 2004 WL 256572, at *7 (Tenn. Ct. App. Feb. 12, 2004) (holding that a trial court is generally not entitled to award attorney's fees for discovery abuse in the absence of a formal motion for monetary sanctions under the Tennessee Rules of Civil Procedure) (citing *Cheatham v. Cheatham*, No. 01A01-9508-CH-00380, 1997 WL 731784, at *8 (Tenn. Ct. App. Nov. 25, 1997) ("[W]e have . . . held that awards for additional legal expenses caused by obstructive behavior should not be awarded in the absence of a proper request for monetary sanctions."); *Turner v. Turner*, No. 01 A01-9506-CV-00255, 1997 WL 136448, at *13 (Tenn. Ct. App. Mar. 27, 1997) ("Awards to help defray a party's legal expenses in a divorce case are based on need, not on conduct of the litigation.")).[9]

The trial court in this case specifically found that the amount of attorney's fees incurred by Mother resulted from Father's recalcitrance in complying with discovery. As noted by the trial court:

> There is plenty of evidence in this record that [Father] would not comply with the discovery. The Court is not going to require the [Mother] to have to suffer the expense or her family to suffer the expense of having to pay for a lawyer to make someone else give information that ought to be given up voluntarily.

Indeed, Father admitted that it had been difficult to obtain information from him concerning his income and assets.

---

pursue legal remedies directly against the companies in which Father holds an interest, as the alimony in solido award represents her marital share in Father's interest in those companies.

[9] The record on appeal does not reflect that Mother filed a formal motion for sanctions.

Balancing both Father's lack of funds and the alimony in solido awarded to Mother against Father's admitted role in the duration of these proceedings, we discern no abuse of discretion in the trial court's decision to award Mother some reasonable attorney's fees pursuant to Tennessee Code Annotated Section 36-5-103(c). Not all of Mother's attorney's fees, though, are attributable to issues of child custody and support. Indeed, significant issues in this case concerned fault for the demise of the marriage, alimony, and property division. Because we are remanding this case for reconsideration of Father's alimony award, we vacate the trial court's award of all of Mother's requested attorney's fees. Instead, we remand to the trial court for a calculation of Mother's attorney's fees that are attributable only to issues involving child custody and child support.

Coupled with his argument regarding attorney's fee in his statement of the issues, Father also argues that the trial court erred in awarding Mother discretionary costs. Here, the trial court awarded Mother $3,669.75 in discretionary costs. Father, however, does not cite any law concerning the award of discretionary fees in the body of his appellate brief. Pursuant to Rule 54.04(2) of the Tennessee Rules of Civil Procedure, the trial court may award discretionary costs to the prevailing party. *Wade v. Vabnick*, No. W2009-02273-COA-R3-CV, 2010 WL 2025402, at *2 (Tenn. Ct. App. May 24, 2010). Rule 54.04 provides in pertinent part:

> (2) Costs not included in the bill of costs prepared by the clerk are allowable only in the court's discretion. Discretionary costs allowable are: reasonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert witness fees for depositions (or stipulated reports) and for trials, reasonable and necessary interpreter fees for depositions or trials, and guardian ad litem fees; travel expenses are not allowable discretionary costs.

The party seeking an award of discretionary costs bears the burden of demonstrating that it is entitled to such an award. *Carpenter v. Keppler*, 205 S.W.3d 474, 489 (Tenn. Ct. App .2006). This Court reviews any such award under an abuse of discretion standard. *Id.* In determining whether to award discretionary costs, the trial court should:

> (1) determine whether the party requesting the costs is the 'prevailing party,' (2) limit awards to the costs specifically identified in the rule, (3) determine whether the requested costs are necessary and reasonable and (4) determine whether the prevailing party has engaged in conduct during the litigation that warrants depriving it of the discretionary costs

to which it might otherwise be entitled.

*Mass. Mutual Life Ins. Co. v. Jefferson*, 104 S.W.3d 13, 35-36 (Tenn. Ct. App. 2002). Here, Father does not argue that Mother was not the prevailing party in the litigation, that the trial court included costs not identified by the rule, or that the costs were not reasonable and necessary. In addition, nothing in the record indicates that Mother engaged in contumacious conduct that would warrant depriving her of any award of discretionary costs. Accordingly, the trial court did not abuse its discretion in awarding discretionary costs to Mother.

Mother next requests an award of attorney's fees incurred on appeal, again pursuant to Tennessee Code Annotated Section 36-5-103(c). We first note that the trial court entered an order after the final decree of divorce awarding Mother $3,000.00 in attorney's fees in anticipation of this appeal. This Court has previously held that a trial court commits an error of law and abuses its discretion when it awards fees for "future litigation." *Airline Const. Inc. v. Barr*, 807 S.W.2d 247, 270 (Tenn. Ct. App. 1990). Indeed, "when a party is seeking attorney fees incurred on an appeal, that request, absent any statute or rule directing otherwise, **must be directed first to the appellate court** in a timely fashion." *Killingsworth v. Ted Russell Ford, Inc.*, No. E2004-02597-COA-R3-CV, 2006 WL 26355, at *7 (Tenn. Ct. App. Jan. 5, 2006), *aff'd*, 205 S.W.3d 406 (Tenn. 2006) (emphasis added). The trial court was therefore not authorized to award any fees to Mother in expectation of this appeal. The award of $3,000.00 in appellate attorney's fees is therefore reversed.

An award of appellate attorney's fees is a matter within this Court's sound discretion. *In re Jaiden W.*, No. M2014-00953-COA-R3-JV, 2015 WL 1881092, at *4 (Tenn. Ct. App. Apr. 23, 2015) (citing *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995) (involving both child support and alimony)). In considering a request for attorney's fees on appeal, we consider the requesting party's ability to pay such fees, the requesting party's success on appeal, whether the appeal was taken in good faith, and any other equitable factors relevant in a given case. *Darvarmanesh v. Gharachoulou*, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at *16 (Tenn. Ct. App. July 19, 2005). Because of the factors militating against an award of attorney's fees discussed above and the fact that Father has prevailed on some of the issues in this case, we decline to award attorney's fees on appeal.

### Conclusion

The judgment of the Williamson County Chancery Court is affirmed in part, reversed in part, vacated in part, and remanded to the trial court for all further proceedings as are necessary and are consistent with this Opinion. Costs of this appeal are taxed to Appellant, and his surety.

_____
J. STEVEN STAFFORD, JUDGE